**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**STEPHEN M. GUEST,** ***as Administrator of the Estate of Kristine B. Guest, Deceased*****,**

**Plaintiff,**

**No. 06-cv-0500 (GLS/DRH)**

**v.**

**MICHAEL F. HANSEN, PAUL SMITH'S COLLEGE OF ARTS AND SCIENCES, and TONI A. MARRA*****,***

**Defendants.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:**<br>E. Stewart Jones, PLLC<br>28 Second Street<br>Troy, New York 12180 | E. STEWART JONES, JR., ESQ.<br>GEORGE E. LAMARCHE III, ESQ. |
| **FOR THE DEFENDANTS:**<br>*For Defendants Paul Smith's College and Marra* | |
| Pennock, Breedlove & Noll, LLP<br>1407 Route 9, Nine North<br>Building 4<br>Clifton Park, New York 12065 | BRIAN BREEDLOVE, ESQ.<br>TRACY LAROCQUE, ESQ. |
| *For Defendant Hansen* | |
| Bivona & Cohen, PC<br>98 Pine Street<br>New York, New York 10005 | KEVIN J. DONNELLY, ESQ. |

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Stephen M. Guest brings this negligence action to recover damages arising out of the death of his daughter, Kristine B. Guest ("Guest"), who died in a snowmobiling accident on Lower St. Regis Lake in Franklin County, New York on February 6, 2005. At the time of her death, Guest was a passenger on a snowmobile that was owned by defendant Michael F. Hansen and was being operated by Joshua L. Rau, a student at defendant Paul Smith's College of Arts and Sciences. Rau, the operator of the snowmobile, also died in the accident. The court has jurisdiction pursuant to 28 U.S.C. § 1332. Pending is a motion by defendants Paul Smith's College of Arts and Sciences and Toni Marra for summary judgment. For the reasons that follow, the motion for summary judgment is granted as to the moving defendants.

### II. Facts[1]

[1]The facts are culled from the respective Statements of Material Facts submitted by the parties pursuant to N.D.N.Y. R. 7.1(a)(3). *See Dkt. Nos. 28, 33, 35.* The facts are recited in the light most favorable to the plaintiff, as the nonmoving party.

## A. <u>Events Leading to the Deaths of Rau and Guest</u>

Sometime in late January or early February of 2005, Joshua Rau, a sophomore at Paul Smith's College of Arts and Sciences ("Paul Smith's College" or "College") in Franklin County, New York, invited Kristine Guest and several other friends to come and visit him to celebrate his twentieth birthday. Thus, on the morning of Saturday, February 5, 2005, Guest and three other women drove from Northeastern University in Boston, where they had stayed on Friday night, to Paul Smith's College. At the time, Guest, like Rau, was twenty years old, and was a sophomore at Quinnipiac College in Connecticut.

Guest and her friends arrived at Paul Smith's College at approximately 4:00 p.m. on Saturday afternoon. Upon their arrival, they freshened up and then went to dinner in the town of Saranac Lake with Rau. None of the party consumed any alcoholic beverages at dinner, or while in Saranac Lake. The group returned to Rau's dorm room at Paul Smith's College at 8:00 or 9:00 p.m., at which point Rau prepared a mixed drink, or punch, consisting of Jagermeister, peach Schnapps, and pineapple juice. The concoction was a specialty of Rau's; he had prepared the same drink for the women during a previous visit to Quinnipiac. The

group of friends hung out in Rau's dorm room, and passed the time by playing a drinking game called "checkers." The game was played much like ordinary checkers, except that shot glasses filled with the Jagermeister concoction were substituted in place of the usual red and black checker pieces. Under the rules of the game, a player whose shot glass was "jumped" by an opposing player was required to drink the contents of the shot glass. Both Guest and Rau participated in the game of checkers.

At around 10:00 p.m., after the game of checkers had wound down, Rau, Guest, and their friends walked down to the frozen shore of the Lower St. Regis Lake (the "Lake"). The Lake abuts the southwest side of the College campus, and is about fifteen steps from the entrance to Rau's dormitory, Clinton Hall. The group brought the remainder of the Jagermeister-based mixed drink with them to the Lake in Nalgene bottles.[2]

There was a bonfire out on the frozen Lake, and Rau, Guest, and the others walked out to join the people who had gathered there. The bonfire had been built by other students from Clinton Hall at around 5:00 or 6:00 p.m. The bonfire around which the students congregated was

---

[2]Nalgene bottles are the ubiquitous screw-capped plastic bottles--often brightly colored--which are prized by backpackers and campers for their durability, odor-resisting properties, and environmental friendliness, and used by college students to carry their water to class, or–as in this case–to transport alcoholic beverages without fear of detection.

approximately 200 feet from the shore. The pyre was visible from the campus, but the party–if such it could be called–was not audible from inside the campus dormitories. Paul Smith's College does not own the Lake; thus, the bonfire was not on College property.

According to the recollection of one witness, when the group reached the bonfire shortly after 10:00 p.m., no one there appeared to be overly intoxicated. Rau, Guest, and their friends were likewise not intoxicated at that time, although they were feeling happy and/or "buzzed." Rau and Guest were at the bonfire on and off between the hours of 10:00 p.m. and 3:30 a.m. Like the other revelers, they returned to the campus for warmth from time to time. The party was a raucous affair.[3] Between eighty and one hundred people were in attendance; alcohol was present in abundance; people threw cups of gasoline onto the fire; snowmobiles were riding about, sometimes at high rates of speed; and students were intoxicated, some of them to the point that their voices rang out in shouts. In short, to at least one observer, the party was out of hand.

[3]The College disputes this characterization. As the College would have it, the gathering was more low key.

At around 3:00 or 3:30 a.m. on the morning of February 6, 2005, the crowd at the bonfire began to disperse. Rau, Guest, and their friends left the bonfire at around 3:30 a.m., and returned to Rau's dorm room. Rau and Guest did not consume any more alcohol upon returning to Rau's room. Sometime later–as early as 4:00 a.m., or as late as 5:00 a.m.–the group returned to the bonfire and the frozen Lake with the intention of watching the sun rise.[4] At that time, there were approximately twelve people at the bonfire, and there were as many as four snowmobiles on the Lake. Witnesses recall that Rau did not appear intoxicated when he was out on the Lake at around 4:30 or 5:00 a.m.

Fog had blanketed the Lake throughout much of the night. In fact, at around 11:00 p.m., Rau had sought to borrow a friend's snowmobile, but the friend had refused due to the heavy fog. However, when Rau and Guest returned to the bonfire at 4:00 or 5:00 a.m., the fog had perhaps lessened to some extent. Rau asked his friend, Christopher Hansen, if he could use Hansen's snowmobile[5] while they waited for the sun to rise, and

[4]In that area, the sun rose on February 6, 2005, at 7:08 a.m. Thus, it was still dark when the group returned to the bonfire.

[5]The snowmobile was owned by Christopher Hansen's father, Michael F. Hansen, a defendant herein.

Hansen assented. Rau first drove two of Guest's friends for a ride around the Lake. Helmets were available for their use, but neither Rau nor the two women used the helmets. After escorting the first two women around the Lake, Guest and Rau set off together on the Hansen snowmobile, with Rau driving. Neither Rau nor Guest wore a helmet. When the snowmobile did not return after five minutes, Hansen went to look for his friends. He came upon the overturned snowmobile near Peter's Rock, a peninsula in Lower St. Regis Lake, the land on which is owned by Paul Smith's College. The sled had struck the rocky promontory. The bodies of Rau and Guest lay in the snow near Peter's Rock. Both Rau and Guest died as a result of their injuries.

**B. <u>The Actions of College Staff</u>**

In the early morning hours of February 6, 2005, Toni Marra, then Director of Residence Life, and Jamie Shova, a Campus Safety Officer, went down to the Lower St. Regis Lake after receiving a report that someone had gone missing, or been injured on the Lake. Marra and Shova arrived at the Lake at approximately 12:45 a.m., only to learn that the report had been in error. They lingered for a time, and spoke with a number of the students gathered on the frozen Lake. Although it was

apparent to Shova that students were drinking, and that a potentially dangerous situation existed, Marra and Shova elected not to call the police.[6] Further, although they may have encouraged the students to disperse or to be safe, they did not threaten them with disciplinary action. As Safety Officer Shova explained, he had no jurisdiction on the Lake. At some point, Marra and Shova departed. No college officials were present on the Lake when Rau and Guest returned to the Lake from Rau's dorm room at 4:00 or 5:00 a.m.

## C. College Policies and Procedures

Paul Smith's College's polices and procedures for the 2004-2005 school year were set forth in a document referred to as the Community Guide. Pursuant to College policy, as delineated in the Community Guide, students under the age of 21 were prohibited from consuming or possessing alcoholic beverages. More broadly, the Community Guide stated that the violation of federal, state, or local laws would constitute a violation of the College's Student Conduct Code. Additionally, although students were permitted to have snowmobiles, the use of snowmobiles on College-owned property was forbidden. Thus, in order to gain access to

[6]Shova was inclined to call the police, but was overruled by Marra.

the Lake, Christopher Hansen would transport his snowmobile via a trailer to an inlet down the shoreline which was not on College property.

### D. <u>Procedural History</u>

The Complaint in this action was filed on April 24, 2006. *Dkt. 1.* The College and Toni Marra answered the Complaint on May 10, 2006, and asserted cross claims against co-defendants Michael Hansen and the Estate of Joshua Rau, seeking contribution and/or indemnification. *Dkt. 4.* Michael Hansen filed an Answer on May 24, 2006, and asserted cross claims against the College, Toni Marra, and the Estate of Joshua Rau. *Dkt. 6.* By Stipulation and Order dated October 4, 2006, all claims and cross-claims by and against the Estate of Joshua Rau were dismissed. *Dkt. 18.*

## III. <u>Discussion</u>

### A. <u>Standard of Review</u>

The standard for the grant of summary judgment is well-established, and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### B. <u>Existence of a Duty of Care</u>

The threshold question in this case, as in any negligence action, is whether or not the defendant owed a duty of care to the plaintiff. *See Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 232 (N.Y. 2001). The existence of a duty of care is a question of law for the court. *Purdy v. Pub. Adm'r of County of Westchester,* 72 N.Y.2d 1, 8 (N.Y. 1988). In determining whether a duty of care exists, courts have traditionally balanced such factors as "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Hamilton,* 96 N.Y.2d at 232 (quotation and citations omitted). Significantly, the foreseeability of injury does not determine the existence of duty; rather, foreseeability determines the scope of the duty once it is found to exist. *Eiseman v. State of New York,* 70 N.Y.2d 175, 187 (N.Y. 1987); *Hamilton,* 96 N.Y.2d at 232.

The analysis in this case must begin with the proposition that "colleges today in general have no legal duty to shield their students from the dangerous activity of other students." *Eiseman,* 70 N.Y.2d at 190. In other words, New York courts have rejected the doctrine of in loco parentis

at the college level. *See Talbot v. New York Inst. of Tech.,* 639 N.Y.S.2d 135, 136-37 (N.Y. App. Div. 1996); *Lloyd v. Alpha Phi Alpha Fraternity,* Nos. 96-cv-348, 97-cv-565, 1999 WL 47153, at *3 (N.D.N.Y. Jan. 26, 1999); *Gilbert v. St. John's Univ.,* No. 94-cv-1534, 1998 WL 19971, at *4 (E.D.N.Y. Jan. 20, 1998).

Therefore, Rau's status as a student at Paul Smith's College, taken alone, did not create a special relationship between Rau and the College which would give rise to a duty to supervise or control the conduct of Rau and Guest. *Eiseman* is instructive in this regard. In that case, the New York Court of Appeals considered whether a college had the duty to supervise or restrict the activity of a student who was an ex-felon with a history of drug abuse and criminal conduct. During the summer session following his enrollment at the college, the ex-felon raped and murdered a fellow student at an off-campus apartment. The court declined to impose a duty on the college, relying in part on the fact that the doctrine of in loco parentis did not apply at the college level. *Eiseman,* 70 N.Y.2d at 190; *see also Obiechina v. Colleges of the Seneca,* 652 N.Y.S.2d 702, 705 (N.Y. Sup. Ct. 1996) ("[A]bsent proof of an assumption of a duty by the school to provide safe passage, across the adjacent highway . . . the mere fact that

the injured party was a student does not create the kind of special relationship necessary to impose liability upon the school for negligent acts of third parties.").

Similarly, in *Gilbert v. St. John's University,* No. 94-cv-1534, 1998 WL 19971 (E.D.N.Y. Jan. 20, 1998), the court rejected the argument that a special relationship existed between a group of students and the college such that the college had a duty to supervise the students. In *Gilbert,* a student on the Seton Hall University rugby team sustained severe injuries during a rugby match with the unofficial and unsanctioned St. John's team.[7] The Seton Hall student sued St. John's, alleging negligent supervision and failure to control. The court determined that St. John's had no duty to control its students, noting that "courts have declined to impose a general duty on colleges either to supervise and control student conduct or protect their students from the dangerous activities of other students." *Id.* at * 4.

New York cases regarding collegiate fraternal activities are also revealing. In *Rothbard v. Colgate University,* 652 N.Y.S.2d 146 (N.Y. App. Div. 1997), the plaintiff, who had been injured in a drunken fall from the

[7]St. John's had permanently disbanded its rugby team due to the team's past drunken and rowdy behavior. Nevertheless, the team continued to participate in intercollegiate competition in an unsanctioned capacity.

second floor of a fraternity house, brought suit against Colgate alleging that the university had breached its duty to control or supervise the conduct of students in fraternity houses. The court rejected the imposition of a duty on the university, writing that the plaintiff, a sophomore, "was not a young child in need of constant and close supervision; he was an adult, responsible for his own conduct." *Id.* at 148; *see also Sheehy v. Big Flats Community Day, Inc.,* 73 N.Y.2d 629, 636 (N.Y. 1989) (noting that New York courts have rejected "any argument that a duty exists to protect a consumer of alcohol from the results of his or her own voluntary conduct"). Likewise, in *Lloyd v. Alpha Phi Alpha Fraternity,* Nos. 96-cv-348, 97-cv-565, 1999 WL 47153 (N.D.N.Y. Jan. 26, 1999), the court ruled that Cornell University had no duty to regulate or supervise the conduct of students engaged in fraternity initiation activities, even where some of the activities were alleged to have taken place in a university-owned fraternity house. *Id.* at *2-3; *see also McGlynn v. St. Andrew the Apostle Church,* 761 N.Y.S.2d 151, 153 (N.Y. App. Div. 2003) (Church, which owned premises where a party at which underage guests were drinking took place, was not under a duty to supervise the party or otherwise retain control of its premises.).

In light of the foregoing cases, Paul Smith's College had no legal duty, emanating from in loco parentis or any other special relationship, to supervise or control the conduct of Rau and Guest.[8] Thus, the court is bound to apply the general rule that a defendant "has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." *D'Amico v. Christie,* 71 N.Y.2d 76, 88 (N.Y. 1987). In so doing, the court is conscious of the fact that cases from other jurisdictions have imposed a duty of supervision under circumstances analogous to those presented in this case.[9] However, the court must apply the law of New York.[10]

Plaintiff has argued that even if the College had no duty to supervise or control the conduct of its students, the College assumed such a duty when Toni Marra, Director of Residence Life, and Jamie Shova, Campus Safety Officer, went out onto the Lake. The test for voluntary assumption

---

[8]Whether the College had a moral imperative to provide for the well-being of its students is a different matter. The court does not suggest that the College's alleged laissez-faire attitude towards underage and/or binge drinking–if true–was appropriate or well-advised.

[9]*See, e.g., Furek v. Univ. of Delaware,* 594 A.2d 506 (Del. 1991); *McClure v. Fairfield Univ.,* No. CV000159028, 2003 WL 21524786 (Conn. Super. Ct. June 19, 2003).

[10]New York is not the only jurisdiction to have rejected the doctrine of in loco parentis at the college level. *See, e.g., Freeman v. Busch,* 349 F.3d 582 (8th Cir. 2003); *Bradshaw v. Rawlings,* 612 F.2d 135 (3d Cir. 1979).

of a duty of care is "whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing." *Heard v. City of New York,* 82 N.Y.2d 66, 72 (N.Y. 1993). Here, the actions of Marra and Shova did not place Guest in a more vulnerable position than she otherwise would have been in. The evidence establishes that Marra and Shova did not undertake to stop the party; in fact, they adopted a hands-off approach, implying their acquiescence in the continuation of a dangerous activity that was already underway. Such acquiescence or tacit permission does not amount to the assumption of a duty of care. *See Heard,* 82 N.Y.2d at 73 (Lifeguard did not assume a duty of care when he directed plaintiff not to dive off of wooden jetty, but then, in the face of plaintiff's resistence, told plaintiff he could go ahead; plaintiff "was in no worse position once the lifeguard acquiesced in his dive than if the lifeguard had stood by and done nothing.").[11]

In sum, the College had no duty to supervise or control the conduct of its students and their guests, nor did it assume such a duty. The inquiry

[11]The prohibition on underage drinking contained in the Community Guide likewise did not give rise to a duty on the part of the College. *See Rothbard,* 652 N.Y.S.2d at 148 ("We reject plaintiffs' contention that in [prohibiting certain conduct in the student handbook] the university voluntarily assumed the duty to take affirmative steps to supervise plaintiff and prevent him from engaging in the prohibited activity.").

does not end there, however. The College, like any landowner, was obligated to keep its premises free of known dangerous conditions. *See Maheshwari v. City of New York,* 2 N.Y.3d 288, 294 (N.Y. 2004) ("We have long held that New York landowners owe people on their property a duty of reasonable care under the circumstances to maintain their property in a safe condition.") (quotations and citations omitted). Such "conditions" may include, *inter alia,* intoxicated guests. *See D'Amico,* 71 N.Y.2d at 85 (recognizing "the obligation of a landowner to keep its premises free of known dangerous conditions, which may include intoxicated guests").[12]

This theory of liability–known as premises liability–provides a limited exception to the general rule that "common law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others." *Purdy,* 72 N.Y.2d at 8. However, while a landowner may be liable for injuries caused by an intoxicated guest,

[12]Precedent exists for analyzing negligence claims against universities in this bifurcated fashion. In *Lloyd v. Alpha Phi Alpha Fraternity,* Nos. 96-cv-348, 97-cv-565, 1999 WL 47153 (N.D.N.Y. Jan. 26, 1999), the court considered separately the issues of (1) whether Cornell had a duty to supervise and control fraternity pledge activities, and (2) whether the hazing activities constituted a dangerous condition giving rise to premises liability.

In this case, at first blush, it might appear that plaintiff has abandoned any claim of premises liability. In his brief in opposition to the College's motion for summary judgment, the plaintiff writes that "plaintiff has not alleged the existence of any defect or dangerous condition on the premises itself nor do any of the claims against this defendant arise out of any duty to keep the premises safe for use." *Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., p. 11; Dkt. 32.* However, this statement is better read as the plaintiff's disavowal of any claim arising out of the *physical* conditions of the College's property.

"decisions have uniformly acknowledged that liability may be imposed only for injuries that occurred on defendant's property, or in an area under defendant's control, where defendant had the opportunity to supervise the intoxicated guest." *D'Amico,* 71 N.Y.2d at 85. Thus, in imposing liability on a landowner for the actions of a drunken guest, the critical inquiry is whether the injury–as distinguished from the alcohol consumption–occurred on the defendant's premises. *Id.; see also Wright v. Sunset Recreation, Inc.,* 457 N.Y.S.2d 606, 607 (N.Y. App. Div. 1982) (duty to control conduct of imbibing patrons did not extend to fatal automobile accident occurring off the premises); *Paul v. Hogan,* 392 N.Y.S.2d 766, 768 (N.Y. App. Div. 1977) (hosts of party had no duty to supervise or control guest who, after consuming alcohol at hosts' party, set off in his motorcycle and struck and killed plaintiff's decedent on a public highway).[13]

This case presents the difficult and–as far as the court has been able to determine–novel question as to whether premises liability may be imposed on a landowner where the conduct giving rise to the injury

---

[13]Of course, in appropriate circumstances, liability may be imposed under the New York Dram Shop Act. *See* N.Y. GEN. OBLIG. LAW § 11-101. In this case, however, there is no allegation that the College supplied alcohol to the students.

commences on neighboring land and terminates, tragically, at the border of the landowner's property. As noted, a landowner's liability for the conduct of intoxicated guests is premised on the fiction that an intoxicated guest constitutes a dangerous condition on the land. Unlike a physical defect on the property, however, an intoxicated guest presents a movable threat. Case law has established a bright-line rule that, once the intoxicated person steps across the property line, a landowner is absolved of any further duty of control or supervision. *See Strassner v. Saleem,* 594 N.Y.S.2d 559, 560 (N.Y. Sup. Ct. 1993) (duty to control or supervise intoxicated twenty year old did not extend beyond homeowner's premises, even when accident occurred on public highway adjacent to home); *Diakakis v. Bedrick,* 653 N.Y.S.2d 574, 575 (N.Y. App. Div. 1997).[14] The question here is whether the landowner's duty reasserts itself when the intoxicated tortfeasor and his victim return to the premises, albeit briefly, at the instant of their death.[15]

---

[14]This is in keeping with the rule that "an owner owes no duty to warn or to protect others from a defective or dangerous condition on neighboring premises, unless the owner had created or contributed to it." *Galindo v. Town of Clarkstown,* 2 N.Y.3d 633, 636 (N.Y. 2004).

[15]The College has objected to the admissibility of evidence of Rau's intoxication. However, it is undisputed that Rau consumed alcohol during the course of the night. Thus, for purposes of this motion, the court assumes that Rau was intoxicated at the time of the snowmobile accident. Moreover, the court does not purport to resolve the question of whether the snowmobile accident in this case occurred on the Lake or on College property. Rather, the

Under the circumstances of this case, it does not. As an initial matter, the court is not a proponent of the view that once a drunken guest has left a landowner's property, the landowner may wash his hands of any responsibility for the consequences of his guest's alcohol consumption. However, that is the lesson of *D'Amico v. Christie,* 71 N.Y.2d 76 (N.Y. 1987), among other cases, and the court is bound to apply the rule. Under the constraints of the *D'Amico* rule, it follows that a landowner cannot be held liable if, unbeknownst to him, the drunken guest returns to his property and, immediately upon his return, commits a tort. In such circumstances, the landowner lacks "the opportunity to supervise the intoxicated guest." *D'Amico,* 71 N.Y.2d at 85; *cf. Crowningshield v. Proctor,* 820 N.Y.S.2d 330, 331-32 (N.Y. App. Div. 2006) (homeowner had no duty to protect party guest against unexpected assault by third party).[16]

court assumes for purposes of its ruling that the accident occurred on College property immediately adjacent to the Lake.

[16]This is especially true in this case, where no College employees were present at the time of the accident. *See Bruenn v. Pawlowski,* 738 N.Y.S.2d 805, 806 (N.Y. App. Div. 2002) (granting summary judgment in favor of landowners who were not present at the time of an ATV accident which caused injuries to a third party, on the grounds that, in light of the fact that they were unaware of the conduct, the landowners "owed no duty to prevent or control the conduct of Pawlowski in operating his ATV while in an allegedly intoxicated condition").

That the College had no opportunity to supervise Rau is clear. As already discussed, the College had no duty–or authority[17]–to control Rau's conduct on the Lake, where the fateful snowmobile ride began, and whence the snowmobile was propelled into Peter's Rock. Once Rau "returned" to College property, the College had no time or opportunity to stop him, or to exercise control.[18] Moreover, it does no good to suggest that the College had the "opportunity" to intervene at an earlier stage, by, for example, preventing Rau's consumption of alcohol on College property. A landowner's duty is to control the conduct of his intoxicated guests, not to prevent them from becoming intoxicated. Indeed, under a premises liability theory, the dangerous condition is the intoxicated guest; until such time as the guest becomes intoxicated, no dangerous condition exists.

Accordingly, having determined that the College owed no duty to Guest, the plaintiff's claims against Paul Smith's College and Toni Marra are dismissed.

---

[17]*See Ramsammy v. City of New York,* 628 N.Y.S.2d 693, 694-95 (N.Y. App. Div. 1995) ("Even where as a practical matter defendant could have exercised . . . control, the Court of Appeals has held liability for [the negligent acts of third persons] will generally arise only when the defendant has authority to control the actions of such third persons.") (quotations and citations omitted).

[18]Again, it bears noting that the plaintiff does not allege that Peter's Rock itself was a dangerous condition or obstacle that was negligently maintained by the College.

## C. Claims Against Hansen

Defendant Michael F. Hansen, in an effort to preserve his cross-claims for indemnification and contribution against the College and Marra, submitted a brief in opposition to the College's motion for summary judgment. In the alternative, he argued that if the court were to grant the College's motion for summary judgment on the grounds of assumption of the risk, then under the law of the case, Guest's assumption of the risk would preclude liability as to Hansen as well. In light of the court's determination that the College owed no duty to Guest, the court need not consider the College's argument that Guest assumed the risk of injury. Hansen has not separately moved for dismissal on this basis.

Accordingly, plaintiff's claims against Hansen survive. Hansen's cross claims against the College and Marra are dismissed.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the motion by Paul Smith's College and Toni Marra for summary judgment is GRANTED; and it is further

**ORDERED** that plaintiff Stephen M. Guest's claims against Paul Smith's College and Toni Marra are dismissed; and it is further

**ORDERED** that defendant Michael F. Hansen's cross claims against Paul Smith's College and Toni Marra are dismissed; and it is further

**ORDERED** that the cross claims by Paul Smith's College and Toni Marra against Michael F. Hansen are dismissed.

**IT IS SO ORDERED.**

Dated: December 18, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge